1
2
3
4
5
6
7
8                        IN THE UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10   GREGORY SCOTT TAMAGNI,

11              Petitioner,                    No. CIV S-02-2132 FCD KJM P

12        vs.

13   JOE McGRATH, Warden,

14              Respondent.              FINDINGS AND RECOMMENDATIONS

15   _____/

16              Petitioner is a state prison inmate proceeding pro se with a petition for a writ of

17   habeas corpus under 28 U.S.C. § 2254, challenging his Tehama County convictions for attempted

18   voluntary manslaughter, infliction of corporal injury on a cohabitant and the findings that he had

19   inflicted great bodily injury during the attempted voluntary manslaughter and had a conviction

20   for a prior serious felony.  CT 132.[1]  He challenges the court's failure to instruct on self-defense

21   in relation to the attempted voluntary manslaughter charge and on accident in relation to the

22   corporal injury charge.

23   /////

24   /////

25   _____
          [1]  "CT" is the Clerk's Transcript and "RT" is the Reporter's Transcript of the state trial,
26   lodged with this court.

                                            1

A.  Procedural And Factual Background

Petitioner was charged with attempted murder, infliction of corporal injury on a cohabitant and several sentence enhancements.  CT 2-4.

The jury found petitioner guilty of attempted voluntary manslaughter, a lesser included offense to attempted murder, and found that he had inflicted great bodily injury on the victim.  It also found him guilty of inflicting corporal injury on a cohabitant and found he had a prior conviction for a serious felony.  CT 26-29.

Based on a reading of the record, this court finds the state Court of Appeal's statement of facts to be accurate:

> At about 7 p.m. on July 20, 1999, defendant and his girlfriend, Jennifer Gipson, arrived at Dwayne Keith Shafer's house with Lane McKinney.  Shafer and another man (who was never identified) were present.  The group sat around and drank beer.
>
> However, after defendant refused to allow Gipson to join others who were taking drugs (on the ground that she was pregnant with his baby), Gipson became upset.  Defendant and Gipson then started arguing, and defendant hit her a few times in the head with his hand.  McKinney and Shafer asked defendant to stop.  But, according to McKinney, defendant slapped Gipson a few more times.  According to Shafer, defendant grabbed Gipson's head and "kneed her on the forehead."  Shafer told McKinney that since he had brought the couple over, he had to take care of the situation.
>
> McKinney and the defendant then started a fistfight in the kitchen, which lasted less than five minutes and proceeded to other parts of the house.  According to Shafer, the fight was fair, and McKinney was winning.  However, Shafer subsequently saw defendant with a 12-inch fishing knife in his hand, pursuing McKinney, who was running out of the house.  Bleeding badly, McKinney went to his mother's house and passed out from loss of blood.  Shafer found blood all over his house, which he had originally thought was defendant's blood, given his knowledge of McKinney's fighting prowess.  (Shafer only referred vaguely to McKinney's prowess, testifying that McKinney was doing "what he was supposed to do.")
>
> Defendant, Gipson, and the unidentified man fled.  The knife, inside its sheath, was thrown over a fence.  Gipson flagged down a friend who was driving by in a Peugeot, and all three got in the vehicle and drove off.  But an eyewitness reported the license plate number of the Peugeot, and the car was stopped by Sheriff's

2

deputies.  With a two-inch goose egg on her forehead, Gipson explained to an officer that defendant had hit her four or five times in the head and then kneed her in the head.  She also said that McKinney and Shafer had told defendant to stop hitting her, but he had not.

While in custody, defendant told the officer that he had an abscessed tooth that had caused his jaw to swell and asked to be taken to the hospital.  En route to the hospital, defendant told an officer he would plead to attempted murder as "it was no big deal," but was upset that he was being charged with domestic violence with injury.  Indeed, at the hospital, defendant offered to lead the officer to the knife in exchange for dropping the domestic violence charge.

While defendant was in custody, he did not have and never complained of any injuries from the fight.  There was no blood on his clothing, except for a drop on one tennis shoe.

The knife was found in its sheath.  The blade had blood stains matching McKinney's blood type.  No fingerprints were lifted from the knife.

McKinney spent almost two weeks in the hospital.  He had sustained three stab wounds in his arm and two stab wounds to his side, lost his spleen, a piece of lung, and part of his diaphragm, and needed a colon resection.  At trial, however, McKinney admitted he had bragged to a nurse at the hospital that she "'should see the other guy.'"

In the past, McKinney had been convicted of several crimes, including transportation or sale of methamphetamine, sale of a substance in lieu of a controlled substance, receipt of stolen property, and assault with a deadly weapon, to wit, his foot.  There was no evidence, however, that defendant knew of McKinney's conviction for assault with a deadly weapon.

At trial, Gipson stated that she had lived with defendant since January 1999 and was pregnant with defendant's child.  Contrary to her report to the police, at trial, Gipson denied that defendant had hit her.  She testified that defendant had grabbed her hands and pulled her towards him, and that she had c[o]me forward and hit his chin.  McKinney then hit defendant and the two men started fighting.  She could not recall everything she told the officer, but said she was lying when she told the officer that defendant had hit her.

/////

/////

/////

3

1
2
3
4

> Gipson did not watch or hear McKinney and defendant fight.
> However, she saw blood in the kitchen and observed defendant
> chase McKinney outside.  She did not know who stabbed
> McKinney, and denied seeing defendant with a knife or seeing him
> throw anything over a fence.  She claimed defendant's face was
> swollen after the fight.

5   Answer, Ex. D (Court of Appeal Opinion) at 2-5.

6   II.  AEDPA Standards

7          An application for a writ of habeas corpus by a person in custody under a

8   judgment of a state court can be granted only for violations of the Constitution or laws of the

9   United States.  28 U.S.C. § 2254(a).

10          Federal habeas corpus relief is not available for any claim decided on the merits in

11   state court proceedings unless the state court's adjudication of the claim:

12
13

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established federal law, as
> determined by the Supreme Court of the United States; or

14
15

> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

16    28 U.S.C. § 2254(d).

17          Although "AEDPA does not require a federal habeas court to adopt any one

18   methodology," Lockyer v. Andrade, 538 U.S 63, 71 (2003), there are certain principles that guide

19   its application.

20          First, the "contrary to" and "unreasonable application" clauses are different.  As

21   the Supreme Court has explained:

22
23
24
25
26

> A federal habeas court may issue the writ under the "contrary to"
> clause if the state court applies a rule different from the governing
> law set forth in our cases, or if it decides a case differently than we
> have done on a set of materially indistinguishable facts.  The court
> may grant relief under the "unreasonable application" clause if the
> state court correctly identifies the governing legal principle from
> our decisions but unreasonably applies it to the facts of the
> particular case.  The focus of the latter inquiry is on whether the
> state court's application of clearly established federal law is

4

1  objectively unreasonable, and we stressed in <u>Williams</u> [v. Taylor,
   529 U.S. 362 (2000)] that an unreasonable application is different
2  from an incorrect one.

3  <u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002).  It is the habeas petitioner's burden to show the state

4  court's decision was either contrary to or an unreasonable application of federal law.  <u>Woodford</u>

5  <u>v. Visciotti</u>, 537 U.S. 19, 123 S. Ct. 357, 360 (2002).  It is appropriate to look to lower court

6  decisions to determine what law has been "clearly established" by the Supreme Court and the

7  reasonableness of a particular application of that law.  <u>See</u> <u>Duhaime v. Ducharme</u>, 200 F.3d 597,

8  598 (9th Cir. 2000).

9      Second, so long as the state court adjudicated petitioner's claims on the merits, its

10  decision is entitled to deference, no matter how brief.  <u>Lockyer</u>, 538 U.S. at 76; <u>Downs v. Hoyt</u>,

11  232 F.3d 1031, 1035 (9th Cir. 2000).  However, when the state court does not issue a "reasoned

12  opinion," this court must undertake an independent review of the claims.  <u>Delgado v. Lewis</u>, 223

13  F.3d 976, 982 (9th Cir. 2002).

14      Third, in determining whether a state court decision is entitled to deference, it is

15  not necessary for the state court to cite or even be aware of the controlling federal authorities "so

16  long as neither the reasoning nor the result of the state-court decision contradicts them."  <u>Early v.</u>

17  <u>Packer</u>, 537 U.S. 3, 8 (2003).  Moreover, a state court opinion need not contain "a formulary

18  statement" of federal law, so long as the fair import of its conclusion is consonant with federal

19  law.  <u>Id</u>.

20  III.  <u>Instruction On Self-Defense</u>

21      Petitioner claims the trial court erred in refusing his request for instructions on

22  self-defense to be given in connection with the charge of attempted voluntary manslaughter.  Pet.

23  at 5 & Attach. at 4-11.

24  /////

25  /////

26  /////

1        At the jury instruction conference, defense counsel asked the court to instruct the

2  jury with CALJIC Nos. 5.30 and 5.31 on self-defense.  RT 195.[2]  He argued the instructions were

3  appropriate because the victim struck the first blow, and the witness Shafer believed the blood on

4  the floor was petitioner's, which suggested petitioner was losing the fight.  RT 196.  The court

5  found that while the victim's conduct might have suggested the need to defend oneself, there was

6  no evidence suggesting petitioner was actually in fear of his life.  RT 196-197.

7        On appeal, petitioner challenged the omission of the self-defense instructions.

8  The Court of Appeal rejected his claim:

9              In this case, defendant notes the following circumstantial evidence
           as substantial evidence of his right to self-defense: McKinney's
10         manner of fighting was "highly dangerous"; McKinney "had
           cornered [defendant]"; Shafer thought that McKinney was
11         "winning the fist fight [*sic*]" and that the blood on the floor was
           defendant's, not McKinney's; McKinney had been convicted of
12         assault with a deadly weapon, to wit, his foot; upon admittance to

13  /////

14  _____

15         [2]  CALJIC No.  5.30 reads:

16         It is lawful for a person who is being assaulted to defend [himself]
           [herself] from attack if, as a reasonable person, [he] [she] has
17         grounds for believing and does believe that bodily injury is about
           to be inflicted upon [him] [her]. In doing so, that person may use
18         all force and means which [he] [she] believes to be reasonably
           necessary and which would appear to a reasonable person, in the
19         same or similar circumstances, to be necessary to prevent the injury
           which appears to be imminent.

20  CALJIC No.  5.31 provides:

21

22         An assault with the fists does not justify the person being assaulted
           in using a deadly weapon in self-defense unless that person
23         believes and a reasonable person in the same or similar
           circumstances would believe that the assault is likely to inflict
24         great bodily injury upon [him] [her].

25

26

the hospital, the nurse asked McKinney about his wounds and McKinney replied, "You should see the other guy"; and McKinney did not feel the stab wounds.

This does not, however, amount to substantial evidence that would support the use of a knife in a fistfight in the exercise of self-defense. First, as the Attorney General observes, there was no evidence that defendant knew about McKinney's conviction of assault with a deadly weapon, namely, his foot. Nor was there any evidence that McKinney used his feet in the fight. Thus, the unknown assault conviction could not give rise to an actual or reasonable belief of the need to use deadly force. Second, Shafer's belief that the blood on the floor and elsewhere belonged to defendant is irrelevant: Defendant obviously knew that he was using the knife and that the blood was McKinney's; a reasonable person in defendant's position, while repeatedly stabbing a 12-inch knife into an adversary, would not think that the blood was his own. Third, McKinney's statements to a nurse that "You should see the other guy" can easily be dismissed as bravado in view of defendant's lack of any injuries. In other words, the post-fight statement cannot alter the evidence of defendant's actual condition during the fight, as reflected by his seeming lack of injuries.

Not only is this evidence insufficient to justify the use of a knife in a fistfight, but the other evidence either failed to support the right to use such force or was inconsistent with such a right. First and foremost, this was a fistfight; McKinney had not drawn any weapons. Second, defendant showed no signs of injury from the fight and never complained of any injuries. The absence of injury is inconsistent with a finding that the repeated use of the knife was reasonably necessary to prevent great bodily injury, without some further explanation. Third, when asked whether he thought about breaking up the fight, Shafer stated that the fight was fair. (The fact that at one point Shafer thought McKinney was winning such a fair fight does not suggest that defendant was facing an imminent threat of great bodily harm, making the use of the knife reasonably necessary. In any fight, someone has to win.) Fourth, defendant concedes that "[n]o one testified to a blow-by-blow account of the fight." In fact, Gipson claimed she did not even watch the fight, and McKinney could not remember much. This underscores the deficiency in evidence supporting the use of the knife at any stage of the fight. And finally, while defendant argues that his pursuit of the wounded and bleeding McKinney is not relevant to whether he reasonably believed in the need for self-defense because he did not inflict any wounds during the chase, the chase undercuts defendant's claim that he was acting defensively and not aggressively.

The bottom line is that there was virtually no evidence–and certainly no substantial evidence–that it was necessary for defendant to use a knife in a fistfight for purposes of self-defense.

> There was no evidence that the repeated stabbings to McKinney's arms and side, resulting in the loss of vital organs, was reasonably necessary to avoid the imminent threat of great bodily injury. Thus, there was insufficient evidence to require a self-defense instruction.

Answer, Ex. D at 8-10 (footnote omitted).

In <u>California v. Trombetta</u>, 467 U.S. 479, 485 (1984), the Supreme Court noted its long-held premise, that due process requires "criminal defendants be afforded a meaningful opportunity to present a complete defense." Several Courts of Appeal have interpreted this to encompass a defendant's right to jury instructions on recognized defenses supported by sufficient evidence. <u>Taylor v. Withrow</u>, 288 F.3d 846, 853 (6th Cir.), <u>cert</u>. <u>denied</u>, 537 U.S. 1007 (2002); <u>Bradley v. Duncan</u>, 315 F.3d 1091, 1098-99 (9th Cir. 2002), <u>cert</u>. <u>denied</u>, 540 U.S. 963 (2003). These courts have relied on the fact that the same rule is recognized in federal criminal procedure:

> As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor.

<u>Matthews v. United States</u>, 485 U.S. 58, 63 (1988).

Whether there was the requisite evidentiary support for the omitted instruction is determined by examining state law and the facts before the state court. <u>Taylor v. Withrow</u>, 288 F.3d at 853-54; <u>Lannert v. Jones</u>, 321 F.3d 747, 754-55 (8th Cir.), <u>cert</u>. <u>denied</u>, 540 U.S. 917 (2003).

In California, a person is entitled to defend himself when, as a reasonable person, he is justified in believing that his assailant is going to commit a felony against him. <u>People v. Clark</u>, 130 Cal. App. 3d 371, 377 (3d Dist. 1982), <u>overruled on other grounds in</u> <u>People v. Blakeley</u>, 23 Cal. 4th 82 (2000). However,

/////

/////

/////

8

1

2

3

> [f]irst, only that force which is necessary to repel an attack may be used in self-defense; force which exceeds the necessity is not justified.  Second, deadly force or force likely to cause great bodily injury may be used only to repel an attack which is in itself deadly or likely to cause great bodily injury . . . .

4   Id. at 380.  A defendant may not use "deadly force to repel a nonlethal attack."  People v.

5   Pinholster, 1 Cal. 4th 865, 966 (1992).

6           The evidence in the record of petitioner's trial does not support self-defense

7   instructions.  McKinney remembered "exchang[ing] blows" with petitioner, but remembered

8   little after going outside and seeing blood all over his pants.  RT 24, 25.

9           Shafer testified that McKinney and petitioner began a fistfight after petitioner

10  refused to stop hassling Gipson.  RT 56-57.  The fight moved through the house, but when the

11  two reached the front door, Shafer saw petitioner had a knife.  RT 59, 60.  McKinney did not

12  have a weapon.  RT 70.  Before that, it had not occurred to Shafer to break up the fight because

13  he "thought it was a fair fight," though McKinney appeared to be winning.  RT 68.  There was no

14  testimony suggesting that petitioner was aware of McKinney's conviction for assault with a

15  deadly weapon.

16          Gipson testified that McKinney punched petitioner after petitioner refused to let

17  go of Gipson.  RT 112.  She kept her head down and did not see the subsequent fight.  RT 112.

18  She did see petitioner chase McKinney out of the house and might have seen some blood in the

19  house.  RT 113.

20          When petitioner was arrested, his jaw was swollen and he asked to be taken to a

21  hospital to be treated for an abscessed tooth.  RT 153.  Petitioner attributed the swelling to the

22  tooth, not to any injuries inflicted by McKinney.  RT 154.  The arresting officer did not notice

23  any injuries on petitioner.  RT 153.

24          This evidence is insufficient to show that petitioner's "resort to deadly force was

25  necessary or appeared to be necessary at the time."  Clark, 130 Cal. App. 3d at 380.

26  Accordingly, the state Court of Appeal's determination that the facts did not support the

1   requested self-defense instruction was not unreasonable in light of the record, nor was its

2   decision an unreasonable application of federal law.

3   IV.  <u>Instruction On Accident</u>

4          Although Shafer testified that petitioner "grabbed [Gipson] and kneed her on the

5   forehead . . ." and Gipson police told the "goose egg" on her head was the result of petitioner's

6   kneeing her in the head, she testified at trial that as petitioner pulled her toward him, she fell

7   forward and hit her forehead on petitioner's chin.  RT 55, 110, 151.

8          Appellate counsel argued that the trial court erred by not giving an instruction on

9   accidental injury <u>sua</u> <u>sponte</u>.[3]  Answer, Ex. A at 21 (brief in the Court of Appeal); Pet. at 5 &

10  Attach. at 12-15.  The Court of Appeal rejected the claim:

11         There was evidence in this case of an accidental injury.  Although
           Gipson reported to an officer that the goose-egg bump on her
12         forehead was caused by defendant who kneed her in the head –a
           report corroborated by Shafer at trial–Gipson denied at trial that
13         defendant hit her.  She explained that during their quarrel,
           defendant grabbed her hands, bent them backwards, and pulled her
14         toward him, at which point she hit her head on his chin.

15         However, even assuming that this constituted substantial evidence
           that warranted the accident instruction, the jury resolved the issue
16         adversely to defendant and thus there was no prejudice.  The
           infliction of corporal injury is committed by "[a]ny person who
17         willfully inflicts upon a person who is his or her . . . cohabitant . . .
           corporal injury resulting in a traumatic condition.  (§ 273.5, subd.
18         (a).)  One of the elements for corporal injury is the willful
           infliction of the corporal injury.  (§ 273.5, subd. (a).)  "As used in
19         our penal statutes, the word 'willfully' 'implies simply a purpose or
           willingness to commit the act' (Pen. Code, § 7, subd. 1)."  (<i>In re</i>
20         <i>Smith</i> (1972) 7 Cal.3d 362, 364.  Accordingly, in convicting
           defendant of this offense, the jury necessarily found that

21

22

23         [3]  CALJIC No. 4.45 provides:

24         When a person commits an act or makes an omission through
           misfortune or by accident under circumstances that show [no]
25         [neither] [criminal intent [n]or purpose,] [nor] [[criminal]
           negligence,] [he] [she] does not thereby commit a crime.

26

1    defendant's act was willful and not accidental – in other words, that he
     intentionally inflicted what turned out to be the corporal injury.
2

3    As stated in *People v. Jackson* (2000) 77 Cal.App.4th 574, 578
     "[t]he history of section 273.5 supports the inference that the
4    Legislature intended to define a crime in which the corporal injury
     results from a direct application of force by the defendant upon the
5    victim."  The court concluded that "the section is not violated
     unless the corporal injury results from a direct application of force
6    on the victim by the defendant."  (77 Cal.App.4th at p. 580.)  That
     of course, would not be the case if Gipson's trial testimony is
7    credited.

8    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

9    In this case, even assuming error, defendant has failed to
     demonstrate any prejudice.  The jury expressed no confusion over
10   whether defendant's conduct was willful.  There is nothing to
     suggest that the jury did not use the common and instructed
11   meaning of willful to find that defendant's infliction of corporal
     injury was intentional, thereby rejecting Gipson's contradicted trial
12   testimony that her injury was accidental.

13   Answer, Ex. D at 12-18 (footnote omitted).

14        Accident is a defense under California law, <u>People v. Gonzales</u>, 74 Cal. App. 4th

15   382, 390 (2d Dist. 1999), so petitioner was entitled to an instruction if the theory had evidentiary

16   support.  <u>Bradley v. Duncan</u>, 315 F.3d at 1098-99.  The state Court of Appeal assumed that

17   Gipson's testimony provided a sufficient evidentiary basis for the instruction, but found

18   petitioner had suffered no prejudice from the omission.

19        In <u>Henderson v. Kibbe</u>, 431 U.S. 145, 155 (1977), the Supreme Court held that a

20   habeas petitioner's burden to show prejudice from the omission of a jury instruction "is

21   especially heavy," because an omission or an incomplete instruction has less potential for

22   prejudice than a misstatement of the law.  In <u>Henderson</u>, the court found a failure to give specific

23   instruction on causation was not prejudicial error when the jury had been instructed on the

24   statutory language, which required the jury to find that the defendant had caused the death of the

25   victim, and was told the prosecution must prove all the elements beyond a reasonable doubt.  <u>Id</u>.

26   at 153-54.

1    The jury in petitioner's trial was instructed that "[e]very person who willfully

2    inflicts upon a person with whom he is cohabitating (sic) corporal injury . . . is guilty of violation

3    of Section 273.5 of the Penal Code . . . ."  RT 260; CT 76.  "Willfully" was defined as "a purpose

4    or willingness to commit the act or to make the omission in question.  The word 'willfully' does

5    not require any intent to violate the law, or to injure another, or to acquire any advantage."

6    RT 243; CT 42; see also People v. Thurston, 71 Cal. App. 4th 1050, 1055 (4th Dist. 1999)

7    (spousal injury statute is a general intent crime, requiring only the intent to do the assaultive act).

8    Because the jury found petitioner acted "willfully," see CT 107, it rejected Gipson's testimony

9    that the knee-forehead contact was accidental.  Black's Law Dictionary (7th ed. 1999) at 15

10   (accident is "an unintended and unforeseen injurious occurrence . . . .").

11   Although the Court of Appeal was troubled by the instruction that defined

12   "willfully" as not requiring an intent to injure, it found no prejudice from the trial court's failure

13   to give an instruction on accident, because the "willfulness" instruction also told the jury that the

14   term translated to a purpose or willingness to commit the act and because, in the context of

15   assault, the jury was told that "willfully means that the person committing the act did so

16   intentionally."  Answer, Ex. D at 15-16; RT 258-259; CT 74.

17   This approach is consonant with Henderson v. Kibbe, 431 U.S. at 153-54, which

18   evaluated prejudice from an omitted instruction by considering what the jury was told in other,

19   properly given instructions.  Accordingly, this court cannot say that the state court unreasonably

20   applied federal law in finding that petitioner was not prejudiced by the court's failure to instruct

21   on accident.

22   Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

23   writ of habeas corpus be denied.

24   These findings and recommendations are submitted to the United States District

25   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

26   days after being served with these findings and recommendations, any party may file written

12

objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  June 9, 2005.

_____
UNITED STATES MAGISTRATE JUDGE

2/tama2132.157